## STATE v. JAMES GASH.

### (Filed 27 May, 1919.)

**1. Negligence — Criminal Law — Evidence — Homicide—Manslaughter—Instructions—Trials—Statutes.**

Upon an indictment for criminal negligence in running an auto truck in a city, there was evidence tending to show that the defendant was driving the truck along the street in a populous and principal residential portion of the city, at a rate of speed greatly in excess of the speed limit imposed by statute, that the view was unobstructed for some distance, and defendant having seen children upon the sidewalk or street in front of him, crossed an intersection of another street about 87 to 162 feet from where the children were playing, without giving the signal required by the statute or diminishing his speed, and while talking to another person on the sidewalk, with his head turned aside for the purpose, unexpectedly and without warning changed his course and ran upon the deceased child, inflicting the injury causing the death: *Held*, viewing the evidence in a light most favorable to the State, and disregarding the defendant's evidence to the contrary on his motion as of nonsuit, it was sufficient to be submitted to the jury and to sustain a verdict of involuntary manslaughter; and a charge that the defendant was guilty of involuntary manslaughter, if his excessive speed caused the truck to strike the child, or if the speed was not excessive, but the injury was caused by his carelessness and negligence in failing to keep a lookout ahead, is approved:

**2. Appeal and Error—Instructions.**

An instruction of the judge favorable to the appellant will not be considered on appeal.

**3. Appeal and Error—Instructions—Reinstructions.**

While a closing part of an instruction as to the credibility of a witness, a defendant in a criminal action, might be capable of misconstruction by the jury, it will not be held for reversible error when the judge has recalled the jury to correct it, and further instructed them to acquit him if the evidence in his favor raised a reasonable doubt, and that they should give his testimony the same weight as that of any other witness.

APPEAL by defendant from *Ray, J.,* at March Term, 1919, of BUN-COMBE.

The defendant, a colored chauffeur, was indicted and convicted on a charge of manslaughter and sentenced to four months in jail, with authority to commissioners to hire him out.

*Attorney-General Manning, Assistant Attorney-General Nash and Mark W. Brown for the State.*
*Martin, Rollins & Wright for defendant.*

CLARK, C. J. There is evidence that on 21 January, 1919, about 4 p. m., Porter Cordell, the deceased, a child of three years old, was

playing with one or more of his companions on the north sidewalk of
College Street, in Asheville, near its intersection with Furman Avenue.
Miss Clement and Mr. Lasater went by on the same sidewalk, going east.
They walked slowly and were talking about some chickens in the yard
they were passing, and when they had gotten a distance of from 75 to
150 feet from the point where the child was playing a truck driven
by the defendant crossed the intersection of College Street and Furman
Avenue (also called Pine Street) about 12 feet in front of them, without
blowing the horn or giving any signal, and was going west on the south
side of College Street, about 20 or 25 miles an hour. According to the
evidence of these two witnesses their attention was attracted by the
defendant, who was driving the truck, and his companion calling out
to another colored boy just behind them on the sidewalk, and when they
looked around they "saw these colored men looking back. . . . The
boys on the front seat were looking around talking to this boy that was
immediately behind the witnesses." "The driver was looking back, and
when the conversation between the driver (the defendant) and the boy
on the sidewalk started the car changed its course from the left (south)
side of the street at an angle of thirty degrees towards the deceased and
other children without warning to them." And after the child was
struck the machine struck back "at about the same angle to the left."
A spot of blood was made where the deceased was thrown into the
street. The first sign of skid marks going west were in the center of
the street, or a little to the left of the center, and then the marks went
over to the right (north) side of the street to the spot of blood, between
4 and 6 feet of the curb. Miss Clement says that after she passed the
baby the child went into the street, and when she looked back as the
automobile was going by her she could not see the child in the street
because "there was a telephone pole between her and where the baby
was hit," and that she "hadn't turned around a minute when the car
hit the baby, and it sounded like the noise of hitting a box or a bag of
sand." It was during the interval that the baby went into the street.

There is evidence that the truck skidded 45 feet with both wheels
locked and that if it had been running at eight miles an hour it could
have been stopped in about one foot. The defendant testified that he
saw the children on the sidewalk as he traversed the intersection of
College Street and that he "never saw the baby leave the sidewalk and
never saw it until it hit the car"; that "the first time he saw the baby
was when he hit the car; . . . that if he had seen the baby he
would have stopped the car; that he could not tell how the baby got
out in the street; that the baby ran in front of the car and he tried to
dodge it and changed the course of the truck but the right front fender
struck the child."

The baby was knocked down and the truck ran over his feet "crumpling" his shoe, and he was rushed to the hospital where he suffered for 47 hours; his eyes becoming "swollen shut"; and he vomited blood and gradually got worse until he died 23 January, 1919.

College Street at the place where the baby was killed runs east and west and is practically straight for four blocks, and the children could be seen by persons east of Furman Avenue for a distance of "two and a half blocks," with no obstruction but telephone posts, which are 120 feet apart. The grade at that point was about 3 per cent. It is a residence street and where the child was killed "It was as thickly settled as any part of Asheville."

The above summary is taken almost verbatim from the brief of the State, for the chief, if not the only, exception that requires consideration is the motion for nonsuit, which must be taken in the aspect most favorable to the State upon such motion, and upon examination of the record the facts are summed up correctly, omitting as we must, on such motion, the evidence in favor of the defendant. There was evidence for defendant from which the jury might have found for the defendant, if believed, but that was for the jury and cannot be considered on an appeal from a refusal to nonsuit.

Taking the evidence in this aspect, there was sufficient to submit to the jury tending to show that the death of the child was caused by the criminal negligence of the defendant in that: (*a*) He was operating a motor truck at a speed in excess of 18 miles an hour in violation of Laws 1917, ch. 140, sec. 17; *S. v. McIver,* 175 N. C., 761.

(*b*) He recklessly approached and traversed the intersection of College Street and Furman Avenue, a distance of from 87 to 162 feet from the deceased and other children, whom he says he saw, at a rate of speed much in excess of 10 miles an hour, in violation of the statute. Laws 1917, ch. 140, secs. 15, 17; *S. v. McIver, supra.*

(*c*) He recklessly approached and traversed an intersection of highways and ran over the deceased, who was upon the traveled part of the highway, without slowing down and giving a timely signal, as required by the provision of law just quoted; and without warning to them and while looking in the opposite direction.

(*d*) He recklessly caused the motor truck to change its course from the south side of College Street, without notice or warning to the deceased, and permitted the truck to skid a long distance and collide with the deceased and run over the deceased when he might have avoided injuring him after seeing him on the sidewalk and in the street.

Exceptions 1 and 2 were for refusal of a motion to nonsuit, and Exception 3 was for refusing to give the following instruction: "In no view of the evidence is the defendant guilty of the offense charged, and therefore the jury is directed to return a verdict of not guilty."

STATE *v.* GASH.

Upon the evidence favorable to the State, as above summed up, there was no error in these respects. Exceptions 4 and 5 to the charge are because the court charged the jury that if the defendant was operating the motor in violation of the ordinance or the statute regulating the speed and manner of operation of motor vehicles in any city or town in the State, and if by reason thereof and while exceeding the speed limit he struck the child, this would make him guilty of involuntary manslaughter. In this there was no error. *S. v. McIver,* 175 N. C., 761, which is a full exposition of the law applicable to this case.

Exception 6 is because the court charged the jury that if the defendant was operating the car lawfully and at the rate of speed permitted by law, yet if by reason of a failure to keep a proper lookout he failed to see the deceased in time to avoid injuring him, and "by reason of his carelessness and negligence in failing to keep this lookout" he caused the death of the child, he was guilty. Upon the evidence for the State this failure to keep a lookout was due to the defendant turning his head and looking back to talk to a colored boy on the sidewalk. In this charge there was no error. It was the duty of the defendant, after seeing the children on the sidewalk and knowing that they were likely to run out on the street, unless warned of his approach, to give such warning, which he did not do, but turned his head to look back, and if while so doing he caused the truck to change its course and to strike the deceased, he is guilty of criminal negligence.

Exceptions 7, 8, and 9 need not be considered for that part of the charge was favorable to the defendant.

Exceptions 10 and 11. The language used by the judge in closing his charge might possibly have been misconstrued, and at the instance of the counsel for the defendant he recalled the jury and charged them that if the evidence for the defendant raised a reasonable doubt it was their duty to acquit him, and that the jury had a right to believe him the same as any other witness and to give to his testimony the same weight.

Upon careful consideration of the whole case we find

No error.